William B. Lawless, J.
These actions were commenced in 1961 by petitioners who alleged that they were being denied the right to embrace and practice the religion of Islam as members of a sect headed by one Elijah Muhammad in violation of the Civil Rights Act (U. S. Code, tit. 28, § 1343; U. S. Code, tit. 42, § 1983). (For a detailed account of the background and early stages of these proceedings see: Matter of Bryant v. Wilkins, 45 Misc 2d 923.) The matter first came to this State court after the Federal District Court invoked the Federal rule of abstention but not before finding as a fact that Muslimism is a religion and that the petitioners embraced that religion. In this court, upon a motion for partial summary judgment, two questions were presented:
1. Whether there is a triable issue that the petitioners as Black Muslims constitute a ‘ ‘ religion ’ ’ entitled to exercise that religion within the meaning* of Federal and State law;
2. Whether in their present form the Commissioner’s rules and regulations concerning religious exercises in the State prisons conform to Federal and State law.
As to the first question, we held that petitioners constitute a religion and adopted the Federal court’s earlier finding.
Addressing itself to the second question, this court found that certain rules and regulations and “ statement of policy” promulgated by the Commissioner of Correction and the Department of Correction in 1962 and in 1964 were unreasonably and unduly broad so as to effectively exclude all Muslim inmates *60 from the exercise of every religious service. We held that this constituted an infringement on the petitioners ’ rights as guaranteed by the Federal and State Constitutions and the statutes of this State.
We found that pursuant to section 610 of the Correction Law, the Commissioner of Correction had an obligation to draw rules and regulations which would maintain a delicate balance between prison security and free exercise of religion, including the religion of the Black Muslims and suggested certain guidelines for the Commissioner in the preparation of these rules.
Upon appeal, the Appellate Division, Fourth Department, reversed this second aspect of our decision (Matter of Bryant v. Wilkins, 24 A D 2d 1077) stating that the court erred “in implementing this conclusion [Muslimism is a religion] by directing appellant, Commissioner, to prepare revised regulations which would in effect grant to respondents broad and sweeping rights to practice their religion within a prison of this State.” The matter was remitted to Special Term for a hearing on the rules and regulations of 1962 and the statement of policy of 1964.
In the meantime, the Federal District Court which had retained jurisdiction of a number of these cases pursuant to the direction of the Circuit Court of. Appeals in Sostre v. McGinnis (334 F. 2d 906; cert. den. 379 U. S. 892) had stayed certain of the actions in the belief that constructive State action was imminent. Upon the Appellate Division’s reversal of this court’s decision in Bryant v. Wilkins (supra) the petitioners moved their cases in the Federal District Court on the ground of unreasonable delay on the part of the State.
In SaMarion v. McGinnis (253 F. Supp. 738) Henderson, J. noted that in the defendant McGinnis ’ affidavit in opposition to the motion made by the plaintiffs the Commissioner of Correction admitted that State officials (p. 740) “ have yet to promulgate rules and regulations addressed to the practice of religion by the Black Muslims in the prison system.” The court found that the defendants were thereby effectively preventing any reasonably expeditious action by any State or Federal court toward providing the exercise of Muslimism in the State prisons pursuant to court direction; that those rules and regulations which have been promulgated and have been relied upon by the State in the past do not address themselves to issues surrounding the practice of the Black Muslim religion in the prison system — and in fact are a vehicle for suppression of the Black Muslim religion. The court observed that the function of courts is not to draft rules and regulations for *61 prison security and discipline but to hold hearings or conduct triáis on their reasonableness once they have been drafted. The Commissioner of Correction was directed by Judge Henderson to promulgate, put into effect and file with the Clerk of the District Court a set of rules and regulations to govern the plaintiffs in the practice of their religion. The court noted that the rules and regulations should recognize those rights which normally attend the belief in and practice of a religion in the State prison system, but the rules and regulations may limit and restrict the exercise and practice of those religious rights by Black Muslim inmates in such manner as is necessary to preserve prison security, discipline or other legitimate prison interest.
On May 2, 1966, the Commissioner of Correction promulgated rules and regulations providing for the opportunity for the practice of the religion of Black Muslimism in the State prison system which rules and regulations were the subject of a hearing before this court on the question of their reasonableness. For the purposes of clarity, the court, at the hearing numbered the paragraphs in the rules and regulations and will refer to these numbers in this opinion. (A copy is attached to this opinion as Appendix “A.”)
At the outset of the hearing certain concessions were made by both sides and entered upon the record as to which of the rules and regulations, or the deletion or changes therein, were acceptable to all parties. Proof was then taken on those rules and regulations upon which no accord could be reached.
Paragraphs 2, 5, 6 and 9 which limit attendance at services to those inmates who are “ presently affiliated ” or profess the religion of Muslimism, this court finds too restrictive and deny the free exercise of religion to prospective members of the Muslim faith. Inmates who desire to learn about the religious practice of this sect, although not “ affiliated ” or “ professed ” should be permitted to attend services and also to receive ministration by a minister of the faith consistent with reasonable prison security and discipline. (Correction Law,.§ 610; Matter of Brown v. McGinnis, 10 N Y 2d 531; Sostre v. McGinnis, 334 F. 2d 906; see, also, C. Eric Lincoln, The Black Muslims in America [1961].)
Paragraphs 3, 7,16 and 17 which address themselves to admission of clergy for the purpose of conducting religious services, shall be redrafted to permit the admission of clergy for the purpose of religious ministration, subject only to reasonable limitation by the Commissioner and Wardens for purposes of prison security. Fingerprinting may be permitted in the rules *62 if, for security reasons, fingerprinting is required of all clergy-regardless of their faith.
Paragraph 10 relating to diet of the inmates shall be left to the discretion of the Wardens but where reasonable and practicable and consistent with the ability to do so, religious dietary habits should be accommodated.
Paragraphs 11, 13, 19 and 21 (except that part of paragraph 13 which the parties agreed to delete) this court finds proper so long as the authority given therein for supervision is reasonable and consistent with prison security and is not an undue restriction on the manner in which Muslim services may be conducted.
Censorship shall be left to the discretion of the Wardens but again, the exercise of this restriction should be reasonable and based upon security reasons and not upon religious belief.
CONCLUSION
The Commissioner of Correction is hereby directed to redraft the rules and regulations previously promulgated in accordance with the concessions entered, upon the record in this hearing and consistent with the court’s findings herein. In rewording the rules the court suggests that the word “ Muslim ” and “Muslimism” be used without prefixing the word “Black”. The new rules and regulations so promulgated shall be submitted to this court for approval and thereafter filed with the Clerk of the Federal District Court for the Western District of New York which has continued its jurisdiction of this case. .
APPENDIX C<A”
(1) The following rules and regulations are promulgated ¡by the 'Commissioner of Correction, together with the restrictions promulgated in connection therewith:
(2) The Wardens of the various prisons within the jurisdiction of the Department of Correction of the State of New York are directed to hereby and forthwith provide opportunity and place for religious services for the persons professing the religion of Black Muslimism.
(3) The said Wardens shall admit to the prison for the purpose of conducting services a Black Muslim minister or clergyman having the authorization to so act by the ecclesiastical head of their religious organization being one Elijah Muhammad of Chicago, Illinois, U. S. A. The said Black Muslims shall have the right to purchase a religious book known as the “ Koran ” and said Black Muslims shall have the right to receive religious literature.
(4) The religion of the Black Muslims will be restricted in the following manner for one year:
(5) No prison inmate rtrfiy attend Muslim services who is not presently affiliated with the religious group known as Black Muslims.
(6) The Warden of Attica Prison and all of the Wardens or Superintendents of the various prisons within the jurisdiction of the Department of Correction *63 of the State of New York are directed to hereby and forthwith provide opportunity and place for religious services for the persons professing the religion of Black Muslimism.
(7) The said Warden of Attica Prison and all of the Wardens or Superintendents of the various prisons within the jurisdiction of the Department of Correction of the State of New York shall admit to the prison for the purpose of conducting services a Black Muslim minister or clergyman having the authorization to so act by the ecclesiastical head of their religious organization being one Elijah Muhammad of Chicago, Illinois.
(8) The said Black Muslims shall have the right to purchase a religious book of the religion of Islam known as the “Koran” and said Black Muslims shall have the right to receive religious literature.
(9) Muslim services will be conducted for those inmates who prefer to be members of the Black Muslim religion.
(10) No special diet for religious observance shall be offered to the Black Muslims since no such diet is offered to Protestants, Catholics or Jews, but said Black Muslims shall have the right to abstain from eating any food forbidden by their religious precepts and which is recognized as part of the discipline of their religion, but said Muslims may substitute such other food available at the particular meal.
(11) Religious services shall only be permitted on a day and place within the institution designated by the Warden, which is convenient to the operation and administration of the prison and consistent with the safety and security of the institution.
(12) The newspaper “Muhammad Speaks” will be excluded, as well as any other newspapers or periodicals which are recognized by the Warden as being inflammatory and dangerous to the safety and security of the institution.
(13) The said ministers of the said Black Muslims will not be permitted to preach criminal anarchy, as defined by section 160 of the Penal Law of the State of New York, or treason against the United States of America, or subversion of the United States of America, and such minister shall be so informed by the Warden upon his reception at the prison as a minister. Violation of this regulation will permit the Warden to stop the religious service and shall terminate the said service. The said service shall be monitored by institutional personnel so designated by the Warden, to insure the safety and security of the institution.
(14) No demonstration of an unusual or inflammatory nature such as posturizing or such conduct as may arouse the passions of other inmates shall be permitted in the general population by the Black Muslims.
(15) Literature prepared by the Black Muslims which is inflammatory, anarchistic, treasonable or subversive shall be considered as contraband and subject to seizure and confiscation by the prison officials.
(16) Upon a showing by the Black Muslims and their ministers that they can conform to prison discipline, and that they can conduct services in a proper spiritual manner, without endangering the safety and security of the institution, these rules are subject to change at the discretion of the Commissioner of Correction.
(17) Since certain Muslim ministers have been known to have criminal records including the leader thereof, Elijah Muhammad, as an additional precautionary measure to insure the safety and security of the prison, each Muslim piipister applicant seeking admission as such to a penal institution under the *64 jurisdiction of the Department of Correction shall submit to fingerprinting by the institutional authorities. A Black Muslim minister who is known to have a criminal record shall be denied admission to any institution in the Department of Correction.
(18) No Black Muslim inmate shall conduct services in the place of a Muslim minister.
(19) An appropriate meeting place of worship shall be designated in each prison for holding religious services, and no services may be held outside of such designated place.
(20) No special insignia, regalia or method of dress, or presentation of the person shall be permitted to the Black Muslims.
(21) The Warden may limit the number of inmates who shall attend religious services at one time, as may be reasonably necessary and practically accommodated so as to insure the safety and security of the prison.
All of which is respectfully submitted.
May 2, 1966
paúl d. McGinnis
Commissioner of Correction
State of New York